IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO. 1:21-cr-00169** |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **SHAKUR J. MOSS,** | |
| **Defendant.** | **MEMORANDUM OPINION AND ORDER** |

Currently pending is Defendant Shakur J. Moss's Motion to Dismiss Prosecution of Case Based Upon Government's Intentional Concealment and Withholding of Evidence Material to the Defense and the Issue of Guilt or Punishment; or, in the Alternative, Motion to Eliminate the Sentencing Range Embraced by the Government's Intentional Concealment and Withholding of Material Evidence. (Doc. No. 38.) On May 11, 2022, the United States filed the Government's Opposition to Moss's Motion, to which Moss replied on May 18, 2022. (Doc. Nos. 41, 42.) The Court held a hearing on Moss's Motion on June 24, 2022. After the hearing, Moss and the Government each filed post-hearing briefs. (Doc. Nos. 50, 51.) For the following reasons, Moss's Motion is DENIED.

I. Background

On March 11, 2021, a grand jury for the United States District Court for the Northern District of Ohio returned a two-count indictment charging Moss with one count of Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 841(a) and (b)(1)(A), and one count of being a Felon in Possession of Firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc.

No. 11.) Moss pleaded not guilty to both counts. He was represented by different counsel at the time of his initial plea.

At some point, Moss's prior defense counsel received a proposed plea resolution and related supporting documents from the Government. (Doc. No. 38, PageID# 193.) The Government offered Moss's prior counsel a potential plea resolution with a sentencing range of 168 to 210 months without a trial and with an acceptance of responsibility, or 235 to 293 months after a trial. (*Id.*) According to Moss, this proposed plea resolution incorporated a Base Offense Level of 34, which was predicated upon Moss's alleged possession of 500g to 1.5kg of "ice," or 98.8% pure methamphetamine, under 2D1.1(c)(3) U.S.S.G. (*Id.* at PageID# 193-94.)

Moss now seeks to challenge the Government's purity calculation. On March 15, 2022, Moss's current defense counsel notified the Government that the defense had retained Dr. Robert J. Belloto, Jr. as an expert in Pharmaceutics and Pharmaceutical Chemistry to render an expert opinion as to the purity of the methamphetamine. (*Id.* at PageID# 194.) On April 1, 2022, Dr. Belloto issued his "preliminary findings" regarding the purity of the methamphetamine. (*Id.* at PageID# 195.) After examining the lab notes and calculations performed by the Drug Enforcement Administration (DEA) in this case, Dr. Belloto contested the Government's assertion that the methamphetamine was 98.8% pure. (*Id.*) Dr. Belloto asserted that the methamphetamine was below 80% pure. (*Id.*) Methamphetamine below the 80% purity range would result in a Base Offense Level of 30, which would significantly reduce the sentencing range under the previously proposed plea resolution. (*Id.*)

However, Dr. Belloto indicated that he could not finalize his determination on the purity of the drugs until after he examined the DEA's ".d files" and also inspected and photographed the drugs seized in this case. (*Id.*) The .d files are the raw data generated by a mass spectrometer machine

during a mass spectrometer test. (*See* Doc. No. 41, PageID# 284.) .d files alone are unreadable. To make sense of the raw data contained in the .d files, the user must run the .d files through a software program. The software program then runs various calculations with the data and generates graphs and other results that are readable to users. (*Id.*)

The defense provided the Government with Dr. Belloto's initial findings and requested that the Government provide them with the .d files. (Doc. No. 38, PageID# 195.) In its initial April 6, 2022 response to defense counsel, the Government represented that the DEA no longer had the .d files and so the records were unavailable for production. (*Id.* at PageID# 196.) The Government also refused to allow Dr. Belloto to examine the methamphetamine because he was not licensed through the DEA to handle controlled substances. (*Id.*) Subsequently, however, the Government informed defense counsel on April 29, 2022 that the DEA's .d files *were* preserved, but nevertheless, the Government would not produce them and that the DEA would still not allow Dr. Belloto to examine the drugs seized in this case. (*Id.* at PageID# 199.)

On May 3, 2022, Moss filed the instant Motion, seeking dismissal of prosecution of this case for spoliation of evidence, namely the DEA's .d files. (*Id.* at PageID# 200-01.) Alternatively, Moss asked that if the Court did not dismiss the case, that it impose a sanction against the Government for spoliation of evidence, including finding as a matter of law that the purity of the methamphetamine was less than 80%. (*Id.* at PageID# 203.) The Government filed an Opposition to Moss's Motion on May 11, 2022, to which Moss replied on May 18, 2022. (Doc. Nos. 41, 42.)

The Court conducted a hearing on Moss's Motion on June 24, 2022. During the hearing, the defense called Dr. Belloto as its sole witness. (*See* Draft 6/24/2022 Hearing Transcript.) The defense sought to qualify Dr. Belloto as an expert for the purpose of opining on the defense's need to examine

3

the .d files to determine purity in this case. The Government objected to Dr. Belloto being qualified as a witness. (*Id.* at 18.) The Court took the parties' arguments as to Dr. Belloto's qualifications under advisement and permitted him to testify, pending the Court's determination of whether he qualifies as an expert for purposes of the hearing. (*Id.* at 26.) The Government also called a single witness, Dr. Heather Miller, the DEA senior forensic chemist who tested the methamphetamine seized in this case. (*Id.* at 74-75, 87-89.) After the hearing, the parties each filed post-hearing briefs. (Doc. Nos. 50, 51.) Thus, Moss's Motion is now ripe for a decision.

## II. Analysis

### A. Spoliation

Courts have the "inherent power to control the judicial process." *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)). Among those powers is the ability to impose sanctions for spoliation of evidence. *Id.* A court may impose sanctions if the moving party establishes: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010).

Courts have broad discretion in crafting sanctions. However, "a proper spoliation sanction should serve both fairness and punitive functions." *Id.* (citing *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)). This means that an appropriate sanction is one that both "level[s] the evidentiary playing field," *Vodusek*, 71 F.3d at 156, and has been calibrated according to the degree of fault. *Crown Battery Mfg. Co. v. Club Car, Inc.*, 185 F. Supp. 3d 987, 999 (N.D. Ohio 2016).

Moss argues that this case should be dismissed due to spoliation of evidence, namely the .d files. (Doc. No. 38, PageID# 200.) However, the .d files have not been destroyed. To the contrary, Moss indicates in his Motion that the Government corrected its initial representation to defense counsel and represented that the DEA retained possession over the .d files. (*Id.* at PageID# 201.) Thus, there has been no spoliation of evidence, as the evidence was never destroyed. Accordingly, the Court declines to dismiss prosecution of this case. Further, the Court also declines to apply Moss's alternative proposed sanction of finding, as a matter of law, that the purity of the methamphetamine is less than 80%.

### B. Whether the Government Should be Made to Produce the .d Files

The remaining issue is whether the Government should be made to produce the existing .d files. To decide whether the Government must produce the .d files, the Court must first determine whether to qualify Dr. Belloto as an expert both with respect to whether the .d files are necessary for calculating the purity of the methamphetamine, and also with respect to opining on the purity of the methamphetamine. Second, the Court must then whether the .d files are material to determining the purity of the methamphetamine.

#### 1. Whether Dr. Belloto Qualifies as an Expert

Moss maintains that Dr. Belloto should be qualified as an expert for the purposes of opining as to the defense's need for the .d files to calculate the purity of the methamphetamine, and for determining the purity of the methamphetamine. (Draft 6/24/2022 Hearing Transcript, 10, 25.) According to his CV, Dr. Belloto holds a B.S., M.S., and PhD. in pharmacy, as well as an M.S. in statistics. (*See* Joint Ex. 4.) Since 1994, Dr. Belloto has run his own consulting business, providing a variety of scientific consulting services, including in areas such as pharmacy, statistics, chemistry,

and forensic toxicology, and serving as a consulting expert for attorneys in need of assistance interpreting scientific data. (Draft 6/24/2022 Hearing Transcript, 15-16.) Dr. Belloto estimated that he has testified as an expert witness in nearly 100 jury trials in state and federal courts. (*Id.* at 10.) Dr. Belloto testified that he has run mass spectrometry and gas chromatography analyses in laboratory settings before. (*Id.* at 12.)

However, the Government maintains that Belloto is not qualified as an expert to render opinions regarding whether the .d files are necessary for calculating the methamphetamine, and the purity of the methamphetamine for three reasons. First, Belloto could not recall a single instance in which he provided expert testimony as to the purity of methamphetamine. (*Id.* at 24.) When questioned by the Court about whether he had ever testified as an expert on the purity, or lack thereof, of methamphetamine, Belloto could not recall a single case in which he had done so. (*Id.*) Instead, he asserted that "[o]ften it's not about the purity, it's about identifying the compound. Most cases don't care about the purity or the concentration of something that's in that sample." (*Id.*) Dr. Belloto's answer raises multiple concerns for the Court. For one, Belloto has never provided expert testimony about the purity of methamphetamine in a single court and could not point to any other experience he had that rendered him qualified to opine on the purity of methamphetamine. The Court is also concerned about Belloto's assertion that "most cases don't care about the purity" of controlled substances. Moss's Motion stems from his concerns about the DEA's calculation of the purity of the seized methamphetamine and the impact that purity will have on the calculation of the Base Offense Level under the Sentencing Guidelines. (*See* Doc. No. 38, PageID# 194-95.) Belloto's claim that "most cases don't care about the purity" is irrelevant and incorrect, as this Motion is focused exclusively on the purity of the seized methamphetamine.

Second, Dr. Belloto has no experience as a forensic chemist. Though Dr. Belloto has general experience as a pharmacist and chemist, he has never worked as a forensic chemist or been employed in a forensic chemistry laboratory. (*Id.* at16-17.) Third, Dr. Belloto lacks experience in drug testing and purity analyses. (Doc. No. 51, PageID# 323.) Indeed, Dr. Belloto estimated that the last time he ran a mass spectrometer test himself was about five or six years ago. (*Id.* at 17.) Further, he ran that test on marijuana, not methamphetamine. (*Id.*)

Most troublingly, Dr. Belloto made a basic error in interpreting the DEA's test result graphs. In both an April 15, 2022 email to defense counsel and during the 6/24/2022 hearing, Dr. Belloto opined that the DEA's mass spectrometer graphs demonstrated clear manipulation of the purity data by the DEA because the graphs could not be overlayed perfectly on top of one another. (*See* Joint Ex. 7; Draft 6/24/2022 Hearing Transcript, 54-55.) However, until cross examination, Dr. Belloto failed to recognize that the two graphs contained identical data, but that the bottom graph was simply a magnification in scale of the data. (Draft 6/24/2022 Hearing Transcript, 55-56; *see also* Joint Ex. 7.[1])

Federal Rule of Evidence 702 governs the use of expert testimony. That Rule permits an expert to testify about scientific knowledge if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts

---

[1] On page 2 of Joint Ex. 7, the top graph's y-axis is numbered 0, 500,000, 1,000,000, 1,500,000, and 2,000,000. The bottom graph's y-axis is numbered 0, 50,000, 100,000, 150,000, and 200,000. The bottom graph's lower-numbered y-axis allows the shorter peaks to be more visible. However, a visual comparison between the numbers on the peaks on the two charts demonstrates that the data is identical. Joint Ex. 7; *see also* Joint Ex. 1-A.

of the case." Fed. R. Evid. 702. "The same set of questions applies to expert testimony and science-based test results." *United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021).

A district court acts as a gatekeeper to evaluate the admissibility of each potential witness's testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) (assigning to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand). *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (applying the *Daubert* inquiry to non-scientific testimony); *United States v. LaVictor*, 848 F.3d 428, 440-44 (6th Cir. 2017); *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 526-28 (6th Cir. 2014); *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 528-32 (6th Cir. 2008); *United States v. Jones*, 107 F.3d 1147, 1150-61 (6th Cir. 1997). As the Sixth Circuit has explained:

> *Daubert* attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other. For expert testimony to be admissible, the court must find the expert to be: (1) qualified; (2) h[is] testimony to be relevant; and (3) h[is] testimony to be reliable. There is no 'definitive checklist or test' for striking this balance, but the Supreme Court in *Daubert* did identify four factors that normally bear on the inquiry: (1) whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field.

*LaVictor*, 848 F.3d at 441 (citations and internal formatting removed). *See also In re Scrap Metal*, 527 F.3d at 529.

Because "[m]ulti-factor tests . . . run the risk of obscuring the core inquiry," the Sixth Circuit has noted that "[t]he key handholds of Rule 702 thus bear repeating: To be admissible, any relevant scientific or technical evidence must be the 'product of reliable principles and methods' and must have been 'reliably applied' in the case. That is what matters most." *Gissantaner*, 990 F.3d at 463.

8

The test of reliability is "flexible" and the *Daubert* factors do not constitute a "definitive checklist or test," but may be tailored to the facts of a particular case. *In re Scrap Metal*, 527 F.3d at 529 (citing *Kumho*, 526 U.S. at 150). Indeed, the Sixth Circuit has recognized that the *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony." *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001). *See also In re Scrap Metal*, 527 F.3d at 529.

The Court will consider Dr. Belloto's expert testimony as it relates to the necessity for the .d files in completing a purity analysis of the seized methamphetamine. The Court acknowledges that this is a close call, particularly in light of Dr. Belloto's misinterpretation of the DEA's graphs and also because Dr. Belloto has no experience testifying as an expert with respect to determining the purity of methamphetamine. Indeed, some of his hearing testimony belied his lack of experience in testing for and opining on the purity of methamphetamine.[2] Nevertheless, Dr. Belloto represented himself as an expert in pharmacy and general chemistry, and has testified as an expert witness with respect to these subjects nearly one hundred times. (6/24/2022 Draft Hearing Transcript, 10, 15-16.) Moreover, it is helpful to the Court to consider his opinion in reaching its decision. Therefore, the Court will consider Dr. Belloto's opinion against that of Dr. Miller's.

However, the Court agrees with the Government that Dr. Belloto is not qualified to offer expert opinion testimony as to the purity of the seized methamphetamine itself. Dr. Belloto has no previous experience testifying as an expert regarding purity of controlled substances, particularly methamphetamine. (Draft 6/24/2022 Hearing, 24.) Additionally, Dr. Belloto downplayed the importance of calculating drug purity and incorrectly asserted that "most cases don't care" about drug

---

[2] For example, he testified that a "flame ionization detector doesn't determine purity . . . ." and that "[m]ost cases don't care about the purity . . . of something that's in that sample." (6/24/2022 Draft Hearing Transcript, 17, 25.)

9

purity when this Motion hinges on the calculated purity of the seized methamphetamine. (*Id.*) Finally, Dr. Belloto's demonstrated errors in interpreting the mass spectrometer data in this case reveal a lack of knowledge, skill, and experience in interpreting data related to the purity of methamphetamine. Therefore, the Court will not allow Dr. Belloto to testify as an expert as to the purity of the seized methamphetamine in this case.

### 2. Whether the .d Files are Material to Moss's Case

According to Fed. R. Crim. P. 16(a)(1)(F), "[u]pon a defendant's request, the government must permit a defendant to inspect and to copy or photograph the results or reports of any . . . scientific test or experiment if: (i) the item is within the government's possession, custody, or control; (ii) the attorney for the government knows—or through due diligence could know—that the item exists; and (iii) the item is material to preparing the defense or the government intends to use the item in its case-in-chief at trial." After weighing Dr. Belloto's opinion against Dr. Miller's, the Court concludes for the following reasons that the .d files are immaterial to the preparation of Moss's defense and need not be produced.[3]

First, one of Dr. Belloto's asserted bases for seeking these .d files—that the DEA graphs indicated DEA malfeasance or manipulation because the graphs could not be overlayed—is plainly meritless. (*See* Joint Ex. 7; Draft 6/24/2022 Hearing Transcript, 55.) Dr. Belloto made a mistake in reading these graphs and failed to recognize that the second graph used a more magnified scale so that the peaks would be easier to see. (Draft 6/24/2022 Hearing Transcript, 56-60.) Dr. Belloto presents no other grounds for suspecting that the DEA graphs were deconvoluted in a way that

---

[3] During the hearing, Dr. Belloto also indicated that he needed to examine the seized methamphetamine and/or examine high-resolution photographs of the methamphetamine to help determine the purity of the drugs. However, because Dr. Belloto is not permitted to testify as an expert as to the purity of the methamphetamine, there is no need for him to examine the seized methamphetamine and/or take high-resolution photos, or obtain such photos, of the drugs at issue in this case.

manipulates the purity calculations, other than his own inherent skepticism of the DEA's testing procedures. (*Id.* at 71.)

Second, Dr. Miller testified that the DEA did *not* calculate the purity of the methamphetamine using the gas chromatography-mass spectrometer test. (*Id.* at 85.) In other words, the tests that generated the .d files, the gas chromatograph-mass spectrometer tests ("GC-MS tests"), were not used to calculate the 98.8% purity result. The DEA used the GC-MS tests only to determine whether the seized drugs were methamphetamine. (*Id.* at 122.) Dr. Miller's testimony that the DEA "[doesn't] determine purity from the GC-MS tests" is further supported by the charts in Joint Exhibit 1, DEA Crime Lab Report #174. (*Id.*) Page 2 of Joint Exhibit 1 contains three charts derived from GC-MS analyses. (Joint Ex. 1.) None of these charts list any purity calculation results. (*Id.*) The purity calculations come from the "Quantitation" analyses on pages 3 through 5 of Joint Exhibit 1. (*Id.*)

Instead, the DEA used gas chromatography-flame ionization detection ("GC-FID") testing to calculate the purity of the methamphetamine. (*Id.* at 85.) The GC-FID tests are referred to in the lab report as "quantitation" tests. (*Id.* at 119.) Although Dr. Miller testified that one "could determine vaguely" the purity of the seized methamphetamine from the GC-MS tests, she also testified that the DEA "use[s] GC-FID to get an actual percentage [of purity] via instruments." (*Id.* at 85.) Dr. Belloto baldly asserted that the notion the DEA did not use GC-MS testing to calculate purity was "nonsense," but he offered no evidence or basis for such an opinion. (*Id.* at 51.) In light of Dr. Miller's testimony, and the fact that none of the purity calculations listed in Joint Exhibit 1 were derived from GC-MS tests, the Court finds Dr. Belloto's opinion to be unpersuasive.

Third, there is little concern about manipulative "deconvolution" of the purity test result because the DEA does not deconvolute, or remove background ions from, its GC-FID test results.

According to Dr. Belloto, GC-MS testing is extremely sensitive and will pick up trace amounts of whatever is within the testing chamber, including background air. (*Id.* at 62.) According to Dr. Miller, "deconvolution" is the process of subtracting out interference or another peak from a trace substance picked up by the mass spectrometer. (*Id.* at 99.) Dr. Belloto expressed concern that the DEA may have manipulated its deconvolution calculations by subtracting out dilutants or adulterants from the seized methamphetamine to make the drugs appear purer than they truly are. (*Id.* at 43-45.) However, as discussed above, the purity percentage was calculated using the GC-FID tests, not the GC-MS tests. Dr. Miller testified that "[t]he GC-FID, the quant test, does not have anything deconvoluted from it." (*Id.* at 119.) Rather, the GC-FID testing instrument automatically prints the purity calculation report using the data obtained through the GC-FID test. (*Id.* at 126.) Because the methamphetamine's purity was calculated using the GC-FID results—which are not subject to any subjective deconvolution calculations—there is no concern about deconvolution of the purity results. Therefore, rerunning the GC-MS tests from the raw .d files without any deconvolution would not alter the purity calculations in any way.

Fourth, the .d files do not contain any data that would allow Dr. Belloto to determine whether the seized methamphetamine is made up of L-methamphetamine or D-methamphetamine isomers. Dr. Belloto explained that one isomer of methamphetamine, L-methamphetamine or levmetamfet, is used in over-the-counter drugs like inhalers and nasal decongestants. (*Id.* at 42.) L-methamphetamine is, at an atomic level, methamphetamine but its molecules are arranged in such a way that it functions only as a nasal decongestant when ingested, not a psychoactive street drug capable of making the user "high." D-methamphetamine's molecules, on the other hand, are arranged in such a way that when a user ingests D-methamphetamine, the user experiences a psychoactive

"high." (*Id.* at 42, 53-54.) Dr. Belloto testified that one deficiency of the DEA's testing of the seized methamphetamine is that the DEA failed to determine which methamphetamine isomers were present in the seized methamphetamine—i.e., whether some or all of the seized methamphetamine was L-methamphetamine, a nasal decongestant, rather than D-methamphetamine, a psychoactive street drug. (*Id.*) However, the GC-MS .d files do not contain any data that would allow a scientist to determine the type of isomers present in the seized methamphetamine. (*Id.* at 122-23.) If defense counsel wishes to conduct such isomer testing on the seized methamphetamine, they should retain a witness with the requisite DEA licensure and access to laboratory equipment who could run such a test. The .d files are otherwise immaterial in determining the particular type of methamphetamine isomers present in the seized drugs.

### III.   Conclusion

For the reasons set forth above, the Court concludes that the .d files are immaterial to the preparation of Moss's case and the Government need not produce the .d files. Moss's Motion is DENIED.

**IT IS SO ORDERED.**

Date: July 15, 2022

                     *s/Pamela A. Barker*
                     PAMELA A. BARKER
                     U. S. DISTRICT JUDGE